USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 97-1403 UNITED STATES OF AMERICA, Appellee, v. MAC S. NOAH, Defendant, Appellant. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Ronald R. Lagueux, U.S. District Judge] ___________________ _________________________ Before Selya and Boudin, Circuit Judges, ______________ and Dowd,* Senior District Judge. _____________________ _________________________ Joshua L. Gordon for appellant. ________________ Meghan S. Skelton, Attorney, Tax Division, U.S. Dep't of __________________ Justice, with whom Loretta C. Argrett, Assistant Attorney _____________________ General, Robert E. Lindsay and Alan Hechtkopf, Attorneys, Tax __________________ _______________ Division, and Sheldon Whitehouse, United States Attorney, were on __________________ brief, for the United States. _________________________ December 2, 1997 _________________________ _______________ *Of the Northern District of Ohio, sitting by designation. SELYA, Circuit Judge. Defendant-appellant Mac S. Noah, SELYA, Circuit Judge. _____________ a professional tax preparer, implores us to set aside his conviction on multiple counts of knowingly presenting fraudulent tax returns to the Internal Revenue Service (IRS). Noah insists, in a mien reminiscent of the legendary Perry Mason, that the evidence produced at his trial actually establishes the guilt of a third person.1 In addition, he maintains that the trial judge committed reversible error by denying a motion in limine, refusing to allow him to act as his own lawyer, exhibiting impermissible bias, and imposing an overly harsh sentence. Concluding, as we do, that none of these arguments hold water, we affirm. I. BACKGROUND I. BACKGROUND We present the pertinent facts in the light most favorable to the jury verdict, consistent with record support. See United States v. Rivera-Gomez, 67 F.3d 993, 995 (1st Cir. ___ ______________ ____________ 1995); United States v. Maraj, 947 F.2d 520, 522 (1st Cir. 1991). _____________ _____ In 1991, Noah, a citizen of Liberia, launched an enterprise called Easy Electronic Tax Service (EETS) in Chicago, Illinois. The business held itself out as able to prepare tax returns, file them electronically with the IRS, and arrange refund anticipation loans through a participating bank. At this  ____________________ 1Mason is, of course, Erle Stanley Gardner's fictional lawyer-hero, idealized in a television series bearing his name, who possessed an uncanny aptitude for exonerating clients by casting blame elsewhere. See generally David McCord, "But Perry ___ _________ _________ Mason Made It Look So Easy!": The Admissibility Of Evidence _________________________________________________________________ Offered By A Criminal Defendant To Suggest That Someone Else Is _________________________________________________________________ Guilty, 63 Tenn. L. Rev. 917 (1996). ______ 2 point (and, indeed, at all times relevant to this case), taxpayers who wished to file their returns electronically could do so only through an approved electronic return originator. To secure such approbation, a tax preparer had to complete an application form, undergo a suitability review, and demonstrate that it possessed the requisite hardware and software. EETS filed such an application and the IRS approved it, thus paving the way for the company to participate in the electronic filing program. In 1993, the appellant opened an EETS office in Providence, Rhode Island, and hired several friends to staff the operation. These fledgling employees had duties that ranged from answering the telephone to compiling client files to photocopying identification cards and W-2 forms. None of the recruits had any relevant professional experience in preparing tax returns or perfecting electronic filings.2 Hence, the appellant alone was responsible for preparing clients' tax returns, transmitting the forms electronically, and arranging loans. In due season, a tax-fraud scheme blossomed. In addition to its customary, client-initiated tax filings, EETS from time to time submitted tax returns that bore the names and social security numbers of actual people, but which were embellished by concocted data (e.g., fictitious or altered W-2 forms, non-existent dependents). Based on these commentitious  ____________________ 2Indeed, in lieu of paying wages, the appellant compensated many of these neophytes by offering to teach them how to prepare and file tax returns via the computer. 3 returns, EETS secured refund anticipation loans payable to the "taxpayers." The appellant then asked various EETS employees to convert the checks representing the loan proceeds into cash and give the realized funds to him, mendaciously telling his minions that he already had given the named beneficiaries equivalent amounts from EETS's operational accounts. In another iteration of the fraud, EETS from time to time would alter real clients' earnings statements, or increase the number of dependents, or both, in order to obtain loans based on larger-than-warranted refunds. In these instances, the appellant would pocket the excess proceeds. Either way, the participating bank would be made whole by means of the fraudulently secured refunds and the IRS would be left holding an empty bag. The scheme proved to be pervasive: after an investigation, the IRS identified EETS as the source of approximately 100 electronic returns, 60 of which contained apocryphal items. Eighteen of those were entirely bogus. All of the latter, including the returns that corresponded to the counts of conviction, involved individuals known personally to the appellant. For example, EETS prepared a false W-2 form and filed a fraudulent tax return in the name of Fred Gayetay. Gayetay's father, Shedrick Gayetay, was an EETS employee hired by Noah. Similarly, EETS prepared fraudulent W-2 forms and other tax documents in the names of Prince and Varwoi Jordan. The Jordan siblings were high school students whose mother, Elizabeth Powell, was a friend of Noah's and also dated Shedrick Gayetay. 4 On July 10, 1996, a federal grand jury in the District of Rhode Island indicted the appellant on six counts of knowingly making and presenting false, fictitious, and fraudulent claims to the IRS in violation of 18 U.S.C. 287 (1994). Following an eight-day trial, the jury found the appellant guilty across the board. Judge Lagueux sentenced him to a 33-month incarcerative term. This appeal ensued. II. ANALYSIS II. ANALYSIS Noah's appellate counsel advances five assignments of error. We address them in the sequence indicated in the initial paragraph of this opinion. A. Sufficiency of the Evidence. A. Sufficiency of the Evidence. ___________________________ An appellate court plays a very circumscribed role in gauging the sufficiency of the evidentiary foundation upon which a criminal conviction rests. The court of appeals neither weighs the credibility of the witnesses nor attempts to assess whether the prosecution succeeded in eliminating every possible theory consistent with the defendant's innocence. See United States v. ___ _____________ Echeverri, 982 F.2d 675, 677 (1st Cir. 1993). Instead, its task _________ is to canvass the evidence (direct and circumstantial) in the light most agreeable to the prosecution and decide whether that evidence, including all plausible inferences extractable therefrom, enables a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime. See United States v. Saccoccia, 58 F.3d 754, 773-74 (1st Cir. ___ ______________ _________ 1995), cert. denied, 116 S. Ct. 1322 (1996); Maraj, 947 F.2d at _____ ______ _____ 5 522-23. The evidence in this case passes the sufficiency test with flying colors. A rational jury easily could have found that Noah was the person at EETS who prepared clients' tax returns and filed refund claims electronically. Given the ubiquity of the spurious data, it would have been reasonable, from this evidence alone, to infer that the appellant knowingly prepared and submitted the fabricated claims. Here, however, there was considerably more. The evidence also established that the appellant knew personally all the individuals whose tax records were falsified; that he had access to the information necessary to complete the fraudulent forms; that he processed the loan applications; that he directed the conversion of the loan proceeds into cash; and that he received the money. We have no doubt but that these facts suffice to ground the verdict. The appellant seeks to weaken this chain of inferences by offering us a new target. We should overturn his conviction, he says, because the evidence, even if legally sufficient to support the jury's verdict, points more directly to the guilt of Shedrick Gayetay. This importuning misperceives the proper office of appellate review. The mere fact that the evidence in a case, viewed from the defendant's coign of vantage, points convincingly to another person as the guilty party does not prevent a conviction. After all, it is for the jury to mull the evidence, assess the credibility of the witnesses, and draw such reasonable inferences 6 as it may choose. Once the jury performs that task and authors a verdict, judicial review thereafter must concentrate on whether the jury's interpretation is sustainable under the governing legal standards. See United States v. Ortiz, 966 F.2d 707, 711 ___ _____________ _____ (1st Cir. 1992) (explaining that a guilty verdict will be upheld as long as it "is supported by a plausible rendition of the record"). Whether the jury plausibly could have pointed the finger of blame at someone else is not the question. In this instance, the conclusion that the jury reached is reasonable in light of the evidence presented at trial and there is no principled basis for overturning the verdict on the ground of evidentiary insufficiency. B. Motion in Limine. B. Motion in Limine. ________________ Some weeks prior to trial, the appellant moved in limine to exclude evidence of bogus tax filings apart from those described in the indictment's six counts. On the brink of trial, the district court heard argument on the motion. Defense counsel claimed that the introduction of the challenged evidence would be "cumulative" and "highly prejudicial," and would consume too much preparation time. Citing Fed. R. Evid. 404(b), the court denied the motion as premature in the absence of a specific evidentiary context. During trial, the government offered only a small quantity of the challenged evidence, which with one exception was received absent any objection. In this venue, the appellant's new lawyer puts a fresh spin on the motion in limine. He asseverates that the district 7 court should have treated it as a request for a bill of particulars and granted it on this basis. We are not persuaded. In the court below, the appellant filed a document that he characterized as a motion in limine and, consistent with counsel's assertion that the admission of the challenged evidence would be cumulative and highly prejudicial, the court reasonably understood the motion as one implicating Rule 404(b). Although a trial court may not rely woodenly on a motion's label and ignore its purport, this motion bore scant similarity to a prototypical motion for bill of particulars, see, e.g., United States v. ___ ____ _____________ Paiva, 892 F.2d 148, 154 (1st Cir. 1989) (describing the purpose _____ of such a bill), and the district court's decision to treat it as what it proclaimed itself to be a motion to limit the introduction of proof of other, related bad acts at trial  cannot be faulted. That said, we discern no error in the court's refusal to grant the motion in limine. Rule 404(b), which authorizes the admission of evidence of "other crimes, wrongs, or acts" committed by the defendant for purposes such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," always must be read in concert with Rule 403, which provides for a balancing of probative value against unfairly prejudicial effect. So read, the combination permits the trial court to exclude "other bad acts" evidence on the ground, inter alia, that it is likely to cause "unfair prejudice" or "confusion [of] the issues," or that it probably 8 will lead to "needless presentation of cumulative evidence." Fed. R. Evid. 403. In this instance, the district court denied the motion in limine without prejudice to later objection because the court could not determine satisfactorily in advance of trial whether the unfairly prejudicial effects (if any) of the evidence of other fraudulent tax filings substantially outweighed that evidence's probative worth. This wait-and-see stance was reasonable under the circumstances. See United States v. ___ ______________ Griffin, 818 F.2d 97, 105 (1st Cir. 1987); Sperberg v. Goodyear _______ ________ ________ Tire & Rubber Co., 519 F.2d 708, 712 (6th Cir. 1975). A court is _________________ not required to make judgment calls about admissibility a priori _ ______ and out of context, and we reject the appellant's assertion that the court below abused its discretion in refusing to do so.3 Nor can the appellant be heard to complain about the lower court's admission of "other bad acts" evidence at trial. During its case in chief, the government introduced evidence anent two fraudulent filings not specifically alluded to in the indictment, neither of which prompted a Rule 404(b) objection.  Consequently, there is no occasion for us to comment upon them. It is settled in this circuit that, when the district court  ____________________ 3The objection on the ground of "too much preparation time" is not persuasive. There were only eighteen totally bogus returns and, if more preparation time were needed, defense counsel could have sought a continuance (which he did not do). Moreover, the motion sought to exclude all such evidence, not to _______ require the government to specify which returns it would offer in evidence. And in all events, given the minute quantity of such evidence actually offered by the government, see infra, any error ___ _____ would have been harmless. 9 tentatively denies a pretrial motion in limine, or temporizes on it, the party objecting to the preliminary in limine determination must renew his objection during the trial, and the failure to do so forfeits any objection. See Griffin, 818 F.2d ___ _______ at 105 (holding that to raise and preserve for review a claim of improperly constructing the Rule 403 balance, a party ordinarily cannot rely on the denial of a motion in limine but must object to the admission of the controversial evidence in the actual trial setting); see also United States v. Holmquist, 36 F.2d 154, ___ ____ _____________ _________ 166 (1st Cir. 1994) (concluding that when a pretrial motion in limine is granted and the court "clearly invites the adversely affected party to offer the evidence at sidebar for the purpose of reassessing the scope and effect of the order in the setting of the actual trial, the exclusion of evidence pursuant to that order may be challenged on appeal only if the party unsuccessfully attempts to offer such evidence in accordance with the terms specified in the order"). The only other use of such evidence occurred when the appellant took the stand as part of the defense case. The prosecutor cross-examined him about one of the first two incidents, again without objection, and also introduced evidence of a third fraudulent filing not specified in the indictment. We must reach the Rule 404(b) issue in connection with that return, inasmuch as the appellant preserved his rights by means of a contemporaneous Rule 404(b) objection. Doing so, we hold that the admission of that evidence which involved a fraudulent 10 return compiled in the name of Dahn (an acquaintance of Noah's)  was proper. The appellant staked his defense on the proposition that he was an innocent dupe, victimized by a lawless employee. As the district court found, the spurious return was highly relevant to show the appellant's guilty knowledge, the existence of a criminal plan, and the absence of mistake, and its probative value outweighed any unfairly prejudicial effects. Since this finding derives adequate support from the record, the trial court did not abuse its discretion in permitting the jury to consider the evidence. See, e.g., United States v. Frankhauser, 80 F.3d ___ ____ _____________ ___________ 641, 648 (1st Cir. 1996); United States v. Aguilar-Aranceta, 58 _____________ ________________ F.3d 796, 798 (1st Cir. 1995); United States v. Rodriguez- ______________ __________ Estrada, 877 F.2d 153, 155-56 (1st Cir. 1989). _______ C. The Right to Self-Representation. C. The Right to Self-Representation. ________________________________ The appellant's most substantial argument on appeal implicates the right to self-representation. His claim is straightforward. He tells us that he repeatedly attempted to assert his right to act as his own lawyer, and that the district court (erroneously, in his view) refused his request. 1. What The Record Reveals. On the first day of 1. What The Record Reveals. _________________________ trial, after the jury had been empaneled but before opening statements, the court denied the appellant's motion in limine. The following exchange then took place: DEFENSE COUNSEL: Excuse me, your Honor. I DEFENSE COUNSEL: _______________ realize that this is highly unusual, but my client wants to express a desire to address the Court. 11 THE COURT: No. That's not appropriate. THE COURT: _________ DEFENDANT: I don't want to address the Court DEFENDANT: _________ on issues between my counsel. I request your Honor  THE COURT: You be quiet. You have a lawyer THE COURT: _________ who speaks for you and that's enough. Be seated, please, while I proceed with this trial. The record is silent with regard to the intended subject of the censored statement. On the third day of trial, the appellant personally presented a motion to proceed pro se. The court heard the motion out of the jury's earshot. The appellant expressed the view that by refusing to offer certain motions and evidence his appointed attorney "caused me a lot of setback" and "have not assisted me." Judge Lagueux pointed out the dangers inherent in the request, noting the appellant's apparent lack of understanding of the rules of evidence and predicting that, by proceeding pro se, the appellant would be "putting himself in prison." On the next day, the dialogue resumed. After again questioning the appellant's ability to represent himself without imperilling his case, the court finally denied the request, declaring that to allow it would cause "a complete disruption of the proceedings." The court then stated in relevant part: THE COURT: I'm satisfied that to allow you THE COURT: _________ to defend yourself in this case would be a disruption, since we are almost through with the Government's case. And to allow you to come in now and discharge your lawyer in midstream would be totally destructive of the orderly process of . . . criminal law, the trial of cases. . . . 12 * * * Your motion is denied because the disruption of the proceedings outweighs your right to represent yourself. If this matter had come up before trial, then I could have dealt with it. I could have allowed you to represent yourself and have standby counsel. DEFENDANT: I didn't know that until we were DEFENDANT: _________ into the trial  THE COURT: But now that the trial has THE COURT: __________ started, it's too disruptive. DEFENDANT: I didn't know that until we were DEFENDANT: _________ into the trial before I found out what I found out. Had I known before, I would have made this motion before the trial begins. THE COURT: Well, it's too late. THE COURT: _________ The appellant made one final allusion to the issue of self-representation on the afternoon of the fifth day of trial. Since he neither mentions this incident in his brief nor relies upon it as comprising part of the assigned error, we do not address it. 2. Discussion. It is apodictic that a criminal 2. Discussion. __________ defendant has a right to reject the appointment of counsel and represent himself at trial. See Faretta v. California, 422 U.S. ___ _______ __________ 806, 814-17 (1975); see also U.S. Const. amend. VI. ___ ____ Nevertheless, "[t]he right to select or refuse specific counsel is always subject to practical courtroom constraints." United ______ States v. Betancourt-Arretuche, 933 F.2d 89, 93 (1st Cir. 1991). ______ ____________________ This has come to mean that, although a criminal defendant's right to serve as his own attorney is absolute if invoked clearly and distinctly prior to the beginning of his trial, the right of 13 self-representation becomes qualified once trial is under way. See United States v. Lawrence, 605 F.2d 1321, 1324 (4th Cir. ___ _____________ ________ 1979); United States ex rel. Maldonado v. Denno, 348 F.2d 12, 15 _______________________________ _____ (2d Cir. 1965). At that point, the presiding judge, in his discretion, may deny a defendant's request to act as his own lawyer. See Robards v. Rees, 789 F.2d 379, 384 (6th Cir. 1986); ___ _______ ____ United States v. Dunlap, 577 F.2d 867, 868 (4th Cir. 1978). _____________ ______ The record in this case fails to show that Noah expressed a desire to represent himself before his trial commenced. Although his appellate counsel maintains that we should infer an intention to make such a desire known to the court from the appellant's aborted effort to speak on his own behalf after the jury had been selected but before opening arguments, he points to nothing in the record say, an offer of proof that would support such an inference. What is more, any such inference is belied by Noah's own statement, on the fourth day of trial, that he "didn't know . . . until we were into the trial" that the court would have allowed him, upon seasonable request, to represent himself. Indeed, Noah declared, "[h]ad I known before, I would have made this motion before the trial _______________________________________________ begins." (emphasis supplied). ______ A defendant's request to represent himself must be communicated to the court clearly and unambiguously. See United ___ ______ States v. Bennett, 539 F.2d 45, 50 (10th Cir. 1976). Here, no ______ _______ 14 such communication took place in advance of trial.4 Consequently, the appellant has no valid claim to an absolute Sixth Amendment right to self-representation. This conclusion that the appellant sought to represent himself only after his trial had commenced leaves unresolved the propriety of the lower court's refusal to permit him to do so when he made such a request during the third and fourth days of trial. We turn now to that question. A district court has considerable discretion to grant or deny a request for self-representation that is not presented until trial is under way. See United States v. Singleton, 107 ___ _____________ _________ F.3d 1091, 1096 (4th Cir.) (citing cases), cert. denied, 118 S. _____ ______ Ct. 84 (1997). But that discretion is not unbridled. It is improper for the court to deny the defendant the right to serve as his own attorney solely because of a perceived lack of legal dexterity, see Faretta, 422 U.S. at 835, education, see Johnstone ___ _______ ___ _________ v. Kelly, 808 F.2d 214, 216 (2d Cir. 1986), or expertise, see _____ ___ United States v. Price, 474 F.2d 1223, 1227 (9th Cir. 1973). ______________ _____ Rather, in the last analysis, the court "must balance the legitimate interests of the defendant in self-representation against the potential disruption of the proceedings already in progress." Williams v. Bartlett, 44 F.3d 95, 99 n.1 (2d Cir. ________ ________  ____________________ 4As mentioned above, the appellant's initial attempt to address the court occurred after the jury had been empaneled. Inasmuch as the ensuing exchange cannot reasonably be viewed as an assertion of the right to proceed pro se, we need not resolve the question of whether the invocation of that right after jury selection should be deemed the functional equivalent of a pretrial assertion. ________ 15 1994). The record suggests that we should treat what occurred on the third and fourth trial days as two halves of a single entreaty and we accept the suggestion. In addressing that two- day colloquy, the appellant points to Judge Lagueux's references to his lack of training and his likely inability to master relevant legal concepts as evidence of discretion run amok. We think that this line of argument reads too much into too little. While the judge did voice such concerns, the transcript persuades us that the decisive factor in his analysis was the effect that granting the motion would have had on the ongoing trial. The judge commented more than once that the government's case was almost complete and that "to allow [the defendant] to come in now and discharge [his] lawyer in midstream would be totally destructive of the orderly process of . . . criminal law." When all was said and done, Judge Lagueux premised the denial of the appellant's motion squarely on the fact that, in the circumstances at hand, the likely disruption of the proceedings militated against indulging the right of self-representation. The reasonableness of this conclusion is scarcely open to question. District courts have an institutional interest in avoiding the disruption of trial proceedings. To permit a defendant to switch roles near the halfway point of a complicated criminal trial runs an obvious risk of dislocating both the court's docket and the orderly progression of the trial. See, ___ e.g., Robards, 789 F.2d at 384. Then, too, such an abrupt about- ____ _______ 16 face would have tended to prejudice the prosecution (which had put in most of its case without knowing that the appellant sought to appear as both lawyer and party). Given these considerations, and bearing in mind the district court's entitlement to attach weight to the presence of competent trial counsel, see, e.g., Williams, 44 F.3d at 99 n.1 (stating that the ___ ____ ________ quality of counsel is among the criteria to be used in deciding whether to permit self-representation once a trial has begun), we do not believe that any abuse of discretion occurred. D. Recusal. D. Recusal. _______ Next, the appellant suggests that Judge Lagueux should have recused himself as biased in respect to the appellant's race, ethnicity, and homeland. This is a serious accusation, and we treat it as such. Bias of any kind, especially bias predicated on traits such as race, ethnicity, or national origin, is antithetic to the fundamental values upon which our system of justice rests. Consequently, appellate courts must zealously guard not only against the actuality of judicial bias but against any appearance of it. Here, however, the appellant's charge is plainly unfounded. It rests wholly on an isolated comment made by the judge to the appellant, a Liberian national, in the course of denying the mid-trial request to proceed pro se. In an apparent effort to cushion the blow (that is, to help the appellant understand that he would receive a fair trial even though he would not be allowed to act as his own attorney), Judge Lagueux 17 commented: "This is the United States of America. You're given more rights here than you ever had in Liberia, I'm sure of that." Although the judge's choice of phrase may have been infelicitous, the comment, when viewed in context, is entirely devoid of any trace of animus.5  We add, moreover, that the record indicates quite vividly that Judge Lagueux conducted himself throughout this eight-day trial in a fair, balanced, and wholly appropriate manner. Under these circumstances, the assignment of error lacks merit. E. The Special Skill Enhancement. E. The Special Skill Enhancement. _____________________________ The appellant's final objection concerns the lower court's decision to increase his offense level (and, thus, his sentence) because he "used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." USSG 3B1.3 (Nov. 1995). Clearly, the court supportably could have found that the appellant employed whatever skill he may have had to facilitate the fraud. Thus, the issue reduces to whether the record sustains a finding that the sum total of the faculties that the appellant used in preparing  ____________________ 5We note that the appellant lodged no contemporaneous objection to this remark (say, by seeking the judge's recusal then and there or by moving for a mistrial). In all likelihood, then, the argument that he now advances is procedurally defaulted. See United States v. Kimball, 73 F.3d 269, 273 (10th ___ ______________ _______ Cir. 1995) (reiterating that "the party seeking recusal . . . must do so in a timely fashion"); United States v. Brinkworth, 68 _____________ __________ F.3d 633, 639 (2d Cir. 1995) (holding that a disqualification motion must be sought "at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim") (citation and internal quotation marks omitted). 18 crooked tax returns and filing them electronically constituted a "special skill" within the meaning of section 3B1.3. The appellant answers this question in the negative; he maintains that filing tax returns electronically is an abecedarian task that anyone can perform. The government answers the question in the affirmative; it maintains that the appellant had acquired a skill set not enjoyed by the public at large, namely, the combination of talents necessary to prepare and file tax returns electronically. The district court shared the government's view and boosted the offense level by two notches in reliance on section 3B1.3. Our review of this determination is bifurcated: we consider the meaning of the term "special skill" de novo and then scrutinize the district court's application of the guideline to the discerned facts for clear error. See United States v. ___ _____________ Connell, 960 F.2d 191, 197-98 (1st Cir. 1992). _______ The Sentencing Commission's application notes disclose that the term "[s]pecial skill" refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." USSG 3B1.3, comment. (n.2). The note enumerates as examples of persons possessing special skills "pilots, lawyers, doctors, accountants, chemists, and demolition experts." Id. The appellant leans ___ heavily on this language, emphasizing his comparative lack of education and the fact that he was not licensed as an accountant. But the text will not bear the weight that the appellant loads 19 upon it. The use of the term "usually" in application note 2 signifies often, but not always. Hence, neither formal education nor professional stature is a necessary concomitant for a special skill adjustment. See United States v. Spencer, 4 F.3d 115, 120 ___ _____________ _______ (2d Cir. 1993); United States v. Hummer, 916 F.2d 186, 191 (4th ______________ ______ Cir. 1990). To the contrary, a special skill can be derived from experience or from self-tutelage. See, e.g., United States v. ___ ____ _____________ Gandy, 36 F.3d 912, 914 (10th Cir. 1994); United States v. Lavin, _____ _____________ _____ 27 F.3d 40, 41 (2d Cir. 1994). The appellant has a fallback position. He insists that, because tax preparation and the electronic filing of returns are relatively simple undertakings, the ability to accomplish these duties cannot be considered a special skill. Even if this self-serving appraisal is accurate a matter that we think is open to debate nothing in the guidelines suggests that the specialness of the faculty necessarily hinges on the complexity of the task to be performed. See United States v. ___ ______________ Lewis, 41 F.3d 1209, 1214 (7th Cir. 1994) (noting that even if _____ "an average person can accomplish a task at which someone with special training or skill is adept," that fact alone "does not . . . convert the activity in question into an ordinary or unspecialized activity"). Thus, consistent with our view of the language and purpose of section 3B1.3, we hold that a skill can be special even though the activity to which the skill is applied is mundane. The key is whether the defendant's skill set elevates him to a level of knowledge and proficiency that 20 eclipses that possessed by the general public. See, e.g., United ___ ____ ______ States v. Peterson, 98 F.3d 502, 506-507 (9th Cir. 1996); United ______ ________ ______ States v. Malgoza, 2 F.3d 1107, 1110-11 (11th Cir. 1993). ______ _______ Against this backdrop, the district court's finding that the appellant exercised a cognizable special skill in committing the offenses of conviction is supportable. The appellant was a professional tax preparer who, though not specially educated, was paid fees to process tax returns, file them electronically, and arrange refund anticipation loans. In a case not unlike this one, the Second Circuit held that an accountant who prepared and filed false tax returns and W-2 forms for his infant children possessed a special skill that increased his chance of succeeding on the fraudulent refund claims. See ___ United States v. Fritzson, 979 F.2d 21, 22 (2d Cir. 1992). We _____________ ________ find this holding persuasive, and we see no reason why the fact that the tax-return preparer is a self-taught practitioner rather than a formally trained accountant should make a dispositive difference. Regardless of matters like licensure and degree, the appellant had to "know and comprehend the extent of the duties and obligations imposed by the tax laws." Id. at 22 (citation ___ and internal quotation marks omitted). And, moreover, we agree that a professional tax preparer's "knowledge of the withholding process, including the roles of the claim and transmittal documents, and how and when to file them, exceeds the knowledge of the average person," id., and justifies a special skill ___ enhancement in this case. Indeed, to be successful in the 21 particular corner of the tax trade that he occupied, Noah's specialized knowledge had to extend into the realm of cyberspace. Two other facts render this conclusion especially appropriate in this case and thus reinforce the district court's determination. First, at all relevant times the IRS authorized only certain individuals approved electronic return originators to submit tax returns by computer. Inasmuch as the appellant had secured such approval (albeit in the name of EETS), the sentencing court readily could find that he possessed a capability which was special in the sense that it was not enjoyed by the populace at large. Second, the record reflects that the appellant procured the services of others by offering to teach them the techniques necessary to perfect electronic tax-return filings. See supra note 2. This circumstance supports an ___ _____ inference that the skill set which the appellant amassed was neither widely known nor easily mastered, and thus buttresses the sentencing court's finding. We need go no further.6 The short of it is that we discern no error in the district court's conclusion that a two- level upward adjustment was warranted. The record allowed the court to find that the appellant had a special skill and used it to perpetrate the offenses of conviction. No more is exigible.  ____________________ 6The applicable guideline precludes a special skill enhancement "if . . . [the] skill is included in the base offense level or specific offense characteristic." USSG 3B1.3; see also ___ ____ Connell, 960 F.2d at 199 (describing operation of proviso). The _______ appellant does not contend that his situation implicates this prophylactic safeguard. 22 See United States v. Young, 932 F.2d 1510, 1515 (D.C. Cir. 1991) ___ ______________ _____ ("Section 3B1.3 properly applies when a defendant uses some pre- existing, legitimate specialized skill not possessed by the general public to facilitate the commission or concealment of a crime."). Affirmed. Affirmed. ________ 23